# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMANDA JONES,<br><br>                 Plaintiff,<br><br>   v.<br><br>DAN KLEINMAN,<br><br>                 Defendant. | Civil Action No. 2:24-CV-10750-BRM-JSA<br><br>**MOTION DATE: NOVEMBER 3, 2025**<br><br>**ORAL ARGUMENT REQUESTED** |

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER N.J.S.A. 2A:53A-55

RANDAZZA | LEGAL GROUP

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

## TABLE OF CONTENTS

1.0    INTRODUCTION ......................................................................................1

2.0    ARGUMENT............................................................................................1

    2.1    New Jersey's Anti-SLAPP Law Applies ....................................1

    2.2    Kleinman's Statements are Not Actionable ...............................3

    2.3    Jones Has Failed to Allege Actual Malice ...............................13

3.0    CONCLUSION .....................................................................................15

CERTIFICATE OF SERVICE..........................................................................17

RANDAZZA | LEGAL GROUP

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States*,
250 U.S. 616 (1919) (Holmes, J., dissenting)......................................................15

*Durando v. Nutley Sun*,
37 A.3d 449 (2012).................................................................................

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)...................................................................................7

*Freedom Mortg. Corp. v. LoanCare, LLC*,
2023 U.S. Dist. LEXIS 115678 (D.N.J. July 6, 2023)............................................1

*Ginsberg v. New York*,
390 U.S. 629 (1968)...................................................................................7

*In re Accutane Litig.*,
194 A.3d 503 (N.J. 2018)..............................................................................1

*Miller v. California*,
413 U.S. 15 (1973)..........................................................................6, 7, 10, 11

*Paucek v. Shaulis*,
349 F.R.D. 498 (D.N.J. 2025)........................................................................2

*Sahs v. Loyola Univ.*,
No. 24-1379, 2025 U.S. Dist. LEXIS 98411 (E.D. La. May 23, 2025).................2

**Other Authorities**

J.G. Thomson, J.A. Marolla, and D.G. Bromley, "Disclaimers and Accounts in
Cases of Catholic Priests Accused of Pedophilia" (1998)....................................5

Amanda Jones, *That Librarian: The Fight Against Book Banning in America* at 55-
56 (2024) (Kindle Ver.) ...............................................................................6

Erika Moen and Matthew Nolan, *Let's Talk About It: The Teen's Guide to Sex,
Relationships, and Being a Human* at 18 (2021) ..............................................9,

Georgia M. Winters and Elizabeth L. Jeglic, "Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters," DEVIANT BEHAVIOR (2017) ............................................................................................5

Susan Raine and Stephen A. Kent, "The grooming of children for sexual abuse in religious settings: Unique characteristics and select case studies," AGGRESSION AND VIOLENT BEHAVIOR, 181 (2019)..............................................................4, 5

**Rules**

Fed. R. Civ. P. 12 ............................................................................................2

RANDAZZA | LEGAL GROUP

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

## 1.0   INTRODUCTION

Amanda Jones seems more interested in demonstrating the righteousness of her *cause* than the validity of her *claims*. Her opposition concedes all issues relevant to the UPEPA analysis, and she fails to explain how Kleinman's statements are actionable. Even if she did, she barely addresses actual malice, an element that she admits is necessary to prevail on her claims. Nor does she object to the Court's consideration of the evidence attached to the Motion, and in fact attaches additional evidence of her own.

In light of her national public figure status and the non-factual nature of Kleinman's statements, to say nothing of the lack of allegations (much less facts) regarding actual malice, the Court should grant Kleinman's Motion.

## 2.0   ARGUMENT

### 2.1   New Jersey's Anti-SLAPP Law Applies

Jones discusses whether New Jersey or Louisiana law should apply to this case, but most of this is unnecessary, as Jones does not identify any meaningful difference between New Jersey and Louisiana law on defamation or false light.[1]

---

[1] In diversity cases, federal courts use the choice-of-law rules of the forum state, and in New Jersey, the first question is "'whether the laws of the states with interest in the litigation are in conflict.'" *Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 U.S. Dist. LEXIS 115678, *5 (D.N.J. July 6, 2023) (quoting *In re Accutane Litig.*, 194 A.3d 503, 517 (N.J. 2018)). A conflict exists "when the application of one or another

With no conflict regarding the substantive law governing Jones's claims, there is no need to undergo a conflict of law analysis for them.

The only alleged conflict is between the states' Anti-SLAPP laws. But even then, there is no conflict because Jones concedes that Kleinman has satisfied prong one of the Anti-SLAPP analysis (ECF No. 54 at 6), and the prong two analysis in federal court is identical to the analysis under Fed. R. Civ. P. 12(c).[2] However, only New Jersey's law has been invoked and only New Jersey's applies in federal court[3]. There is no suggestion that the differences in the Anti-SLAPP laws are offensive or repugnant to the public policy of the other state. Under New Jersey conflicts of law principles, New Jersey law applies here.

Thus, contrary to Jones's claim that Louisiana's law "is different than but not weaker than New Jersey's" (ECF No. at 28), the Court can either apply New Jersey's

---

state's law may alter the outcome of the case, or where the law of one interested state is offensive or repugnant to the public policy of the other," and in the absence of such a conflict, the forum state applies its own law. *In re Accutane Litig.*, 194 A.3d at 517.  New Jersey has a wider window for who is considered to be a public figure, but since Jones concedes this point, the New Jersey advantage becomes irrelevant.

[2] *Paucek v. Shaulis*, 349 F.R.D. 498, 516-17 (D.N.J. 2025) concluded that UPEPA applies in federal court. *Shaulis* found there was a conflict between UPEPA and other states' Anti-SLAPP laws, only because the other states' laws were much narrower than UPEPA, and there were meaningful distinctions between the substantive tort law underlying the claims. *Id*. at 520. This is not the case here.

[3] *Sahs v. Loyola Univ.*, No. 24-1379, 2025 U.S. Dist. LEXIS 98411, *4 (E.D. La. May 23, 2025) (concluding that the Louisiana Anti-SLAPP law is procedural and does not apply in federal court).

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

RANDAZZA | LEGAL GROUP

UPEPA or no Anti-SLAPP law at all. This Court does not even have the ability to do what Jones suggests and apply the Louisiana law. Kleinman did not invoke Louisiana's statute. Even if it could apply in this Court, even if the parties stipulated that it could, the Court does not have the ability to re-write Kleinman's motion as if he had invoked a statute that has been found not to apply in federal court.

### 2.2    Kleinman's Statements are Not Actionable

The crux[4] of this case is whether Kleinman's statements that Jones is a "groomer," that she sexualizes and indoctrinates minors, and that she provides age-inappropriate materials to minors, are false and factual.[5] And if so, whether her claims get over the Actual Malice bar.

In her Opposition, Jones presumes that these terms have clearly universally agreed upon meanings, such that they would be viewed by the average person as factual statements. Jones then makes no attempt to define these terms. This is important because there is a great deal of debate as to what it means to "groom," sexualize, or indoctrinate people, and it goes without saying that whether a book is

---

[4] Jones admits Kleinman satisfies the first Anti-SLAPP prong (ECF No. 54 at 6), leaving only the question of whether she has adequately pled her claims. She further concedes that the analysis for the two claims is essentially identical (*id*. at 36) and that the actual malice standard applies (*id*. at 19).

[5] Several of Kleinman's posts do not contain any of these allegedly defamatory statements. *See* ECF No. 53-1 (addressing paragraphs 23, 27, 41, 42, 53, 63, 66, and 72 of the Complaint). Jones is silent on this point in her Opposition, conceding that these posts are not actionable.

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

appropriate for minors is a matter of opinion. As the Motion shows, there is a nationwide debate about a range of conduct that people like Jones consider to be defensible (*e.g.,* allowing minors to have access to comic books that teach how to use butt plugs and other anal toys) while millions of Americans consider this to be inappropriate and to constitute grooming and sexualizing minors. *See* ECF Nos. 53-6, 53-7, 53-8, & 53-10. Jones thinks her critics have unreasonable opinions about her and other librarians, but that does not make the opinions factual or actionable.

There is no universally accepted definition of "grooming," and academic researchers have acknowledged that an all-encompassing definition for the term remains elusive. *See* Susan Raine and Stephen A. Kent, "The grooming of children for sexual abuse in religious settings: Unique characteristics and select case studies," AGGRESSION AND VIOLENT BEHAVIOR, 181 (2019). Raine and Kent offer the following definition:

> A process by which a person prepares a child, significant adults and the environment for the abuse of the child. Specific goals include gaining access to the child, gaining the child's compliance and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

*Id*. Preparing the environment for grooming often includes occupying a position of trust and befriending family members, such that others in the child's life will

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

disregard evidence of abuse. *Id.*[6]

Perhaps recognizing the lack of precision in the terms Kleinman used, Jones claims Kleinman's posts contain factual representations about Jones personally providing specific books specifically to her own students in her own school library. But none of Kleinman's complained-of statements make such a direct allegation. Only two of the 50 statements refer to Jones's students. ECF No. 1 at ¶¶ 28 & 67. And Kleinman does not claim in any of them that Jones provides specific books to her students. Instead, Kleinman's claim of grooming and sexualizing children is based on Jones's advocacy for these making books with overtly sexual content available to children. This does not mean that Kleinman thinks, claims, or implies

---

[6] A Venn diagram of Jones's conduct and beliefs would intersect strongly with multiple definitions of grooming behavior. Sex offenders often expose children to pornography in order to desensitize them and make sexual acts seem more normal to them. *See, e.g.,* Georgia M. Winters and Elizabeth L. Jeglic, "Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters," DEVIANT BEHAVIOR, 726-727 (2017). "Offenders may also groom the child with access to prohibited activities—ones typically engaged in by adults—for example, drug and alcohol consumption and the viewing of pornography." Raine and Kent at 184-185 (providing discussion of clergy abusers using exposure to pornography as part of the grooming process). Priests often use "credentialing disclaimers" to legitimate behaviors that could potentially discredit them. J.G. Thomson, J.A. Marolla, and D.G. Bromley, "Disclaimers and Accounts in Cases of Catholic Priests Accused of Pedophilia" (1998). This is similar to Jones's arguments that accusations of "grooming" against her are clearly made in bad faith because nobody of her status would ever do such a thing. ECF No. 1 at ¶ 94; ECF No. 54 at 35. And as discussed below, Jones admits to surreptitiously exposing her students to sexual topics at a young age because she knows that directly addressing them would enrage her school and the students' parents.

RANDAZZA | LEGAL GROUP

that Jones herself is secretly handing *Gender Queer* to her particular middle school students.[7] The basis for Kleinman's opinion is that Jones advocates for *Gender Queer* and similar books with graphic depictions of sex being in public libraries at all. Jones herself discusses this issue in her own book, *That Librarian*. She recounts a 2022 challenge to *Gender Queer* in Jefferson County, Louisiana public schools, where the school board allowed it to remain on shelves.[8] Amanda Jones, *That Librarian: The Fight Against Book Banning in America* at 55-56 (2024) (Kindle Ver.).[9] Jones also discusses how *Gender Queer* can be "inspirational" and does not constitute pornography because it doesn't meet the test for obscenity set out in *Miller v. California*, 413 U.S. 15 (1973), a view also expressed by the Kentucky school

---

[7] It seems that Jones thinks that if one doesn't hand an item directly to a minor, they in no way advocate for the minor to get their hands on it. If one advocated to have THC laced gummies sold in drugstores, with no age restrictions on their purchase, this would not necessarily be "giving them to children," but merely putting them where children could get them without restriction. What is really the difference? The difference is certainly not the gulf between actual malice and no actual malice.

[8] According to the Board, the book "illustrates a lived experience that is not often represented in literature, especially in literature geared towards young adult or high school-aged students. Its inclusion in the libraries . . . serves a valuable educational purpose in the schools' efforts to educate the whole student. While reasonable people may differ as to what is offensive, this Board feels the few sexual passages in this material do not rise to the level that the average person, applying contemporary adult community standards, would find to be patently offensive."

[9] This anecdote immediately follows a discussion of how "teenagers in Louisiana can get married at sixteen, so it stands to reason that they should be able to read about aspects of married life that include sex . . . I understand that some parents don't want their teens to read about sex. Those parents need to police their own children's reading and stop policing mine." *Id*. at 42.

6

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

board. *Id*. But the *Miller* test is not for "pornography," but rather for obscenity as to adults. Further, material can be obscene *as to minors*, and thus minors' access to it can be restricted, without it satisfying the *Miller* test. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 473-74 (2025).[10] This attempt to defend her position that such books are properly available to minors by claiming that they are not "obscene" is both a red herring, and completely legally incorrect.  A jury well could find them obscene with respect to minors, and Mr. Kleinman has a right to educate potential venire pool members on what he thinks about the subject.  Jones does not get to control the national framing because she disagrees with Kleinman.

In *That Librarian*, Jones mentions a challenge to the book *Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human*, where a Louisiana library decided to move it from its teen section to its adult nonfiction section. *That*

---

[10] To be clear, there is no argument here that *Gender Queer* fails the *Miller* test.  But Jones's position seems to be that if a work passes *Miller*, there is no reason that it should not be freely accessible to minors.  However, if that were the case, then *Deep Throat* would also be permissible for kids.  And perhaps such materials legally should be, but that does not end the social debate about how you might criticize someone who decided to have an all ages screening of *Caligula* or who decided to stock a cartoon illustrated version of the Marquis DeSade's 120 Days of Sodom.  In *Ginsberg v. New York*, 390 U.S. 629 (1968), the Supreme Court upheld a New York statute which prohibited the sale to minors of certain material which fell short of "obscenity," but which was nevertheless deemed "harmful to juveniles."  Even the legal test for what should be in a minor's hands is not determined by *Miller*.  Here, we are not talking about a legal challenge—but the mere advocacy of a position as to what should be in a minor's hands.  Kleinman has every right to impassioned advocacy of his social and political position.

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

*Librarian* at 56-57. She mentions that she agrees with that decision. *Id*. But she seems to wish us to believe that if it is in the adult nonfiction section, minors can not get to it, and thus this means that she has not advocated for it to be accessible to minors. She is playing fast and loose with the facts. No public library in America has an ID check at the different sections, and no public library in America stops minors from reading books because of the section they are in. Jones is openly proud (except in her briefing to avoid dismissal) of the fact that she advocates for these books to be available in the library - accessible to readers of any age.

Public libraries do not have a beaded doorway curtain with an "adults only" sign as if they are video stores in the 1980s. Perhaps putting these books next to *120 Days of Sodom* or *Nina Hartley's Guide to Total Sex* seems better, but a curious minor attracted by a colorful comic book describing how to insert toys into their rectum would be further harmed by then moving on to the Marquis DeSade, which would presumably be in the same section. The fact is, it does not matter where in the library it is. Nothing keeps minors from books that are obscene as to children, harmful to children, or simply too distasteful for children.[11] To provide an idea of

---

[11] In Jones's own words, "'Libraries are not daycare centers.' A parent shouldn't just drop off their child at the local courthouse or Walmart, just like they shouldn't be dropping their minor children off at the library. Public libraries have adult sections because they also serve adults. If you don't want your child near adult material, you should monitor your own child." *That Librarian* at 42. While this may be excellent

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

what Jones thinks should have no impediment to a child reviewing it, *Let's Talk About It* is a comic book whose *authors and publishers say should be read by minors from ages 14 to 17.* This comic book discusses how "virginity" is a "silly label," with depictions of penises and vaginas. Erika Moen and Matthew Nolan, *Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human* at 18



(2021). It provides tips on how teens can look up pornography and research their favorite porn stars, along with depictions of a penis and anal sex (or maybe just doing it doggy style, it's hard to tell). *Id*. at 164. And it provides detailed instructions, with visual aids, on how to use butt plugs. *Id*. at 119.

---

parenting advice, not all minors are going to be accompanied in a library at all times by a parent. In fact, it would be rare for libraries to become helicopter parent zones. Libraries *should be safe for children.* This is Kleinman's point when he issues his arguments and opinions under the name "SAFE LIBRARIES."

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ





The content in this book is *pornographic* in nature. *See Miller*, 413 U.S. at 18 n.2 (accepting definition of "pornography" as "1: a description of prostitutes or prostitution; 2: a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement"). The book has a graphic depiction of cunnilingus during its discussion of consuming pornography no different from what one might see in an actual pornographic film. *Let's Talk About It* at 165.



Despite this content, it is aimed at children as young as 14. *See* Amazon listing for *Let's Talk About It*, attached as **Exhibit 1**.[12] The title of the book itself says it is a "teen's guide." It is intended for teenagers, not adults, and that is who will read it if it is available in public libraries, which Jones has publicly stated, in her own book, is right and proper.[13] This will inevitably lead to teenagers (*i.e.*, minors, the intended audience) reading a book with graphic depictions of sex and genitalia, instructions about sex, and guidance about looking up pornography. It is certainly reasonable to conclude from Jones's own statements that she advocates for any book that does not satisfy the *Miller* test, which would include *Hustler* magazine, being available with no physical safeguards preventing children of any age from accessing such materials.[14] If Jones wants to advocate for the *Miller* test to be adopted as the test for

---

[12] Available at: https://www.amazon.com/Lets-Talk-About-Teens-Relationships/dp/1984893149 (last accessed Oct. 27, 2025).

[13] Children younger than 14 would also have full access to the book, as parents (rather than library staff) are solely responsible for ensuring children access age appropriate materials.

[14] There is room for debate on both sides as to whether a comic book like this should be in the hands of minors. We can tolerate the opinion that there is no reason to wait until the age of majority to learn how to use a butt plug, or whatever reason the authors of this comic book think that 14 to 17 year olds need this information. But it does not take an unreasonable mind to look at this and question the motivation behind the book and behind wanting it to be accessible to minors. It is certainly not unreasonable for Kleinman to conclude that this is grooming minors, en masse, to engage in such conduct or sexualizing them in a way that bothers him.

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

what adults can provide to minors, she has a First Amendment right to advocate for that to be the state of the law.  But Kleinman the same right to resist her views.

To this, Jones seems to say "so what? I don't advocate that my own students should read such books," as though that were the point Kleinman is making. But even if we focus solely on Jones's middle school students, Jones has admitted to conduct that reasonable people could construe to be grooming or sexualizing children. Jones was interviewed for a March 20, 2021, episode of the podcast "School Librarians United." During this episode, she discusses how she assigns purportedly age-appropriate books to her students to introduce them to concepts that are not age-appropriate, such as consent to sex, because she knows that addressing such topics directly would not be acceptable to her school's administration or her students' parents.[15]  So let us line up the facts.  Parents in her community decided that certain topics are better learned later in life.  Jones, however, decided for herself

---

[15] *See* "118: Modern School Library Programs," SCHOOL LIBRARIANS UNITED (Mar. 20, 2021), available at: https://schoollibrariansunited.libsyn.com/118-modern-school-library-programs (stating at 40:54-41:21: "[s]o did they learn about microaggressions when they read about New Kid? I mean when they read New Kid? Did they learn about, um, consent when they read *Maybe He Just Likes You* because **I can't teach outright teach sexual harassment and consent at a fifth grade school in my community would just, you know, even though it needs to be taught**, but they can read Maybe He Just Likes You by Barbara Dee, which is written on a level 4, the age group of my students and I can encourage them to read that and they can tell me what they have learned themselves"); Declaration of Alex Shepard ("Shepard Reply Dec."), attached as **Exhibit 2**, at ¶ 5 (providing partial transcript of episode).

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

that she wants to introduce these topics to these kids.  So she decided to go behind parents' backs to teach children about sexual topics.  Is this "grooming" or "indoctrination?" In Jones's eyes, perhaps not. It strains neither definition to call this conduct grooming or indoctrination, or both.[16]

Jones rests much of her argument on Kleinman saying that he is stating "facts" in two of his social media posts. *See* ECF No. 1 at ¶¶ 33 & 36.  But claiming a statement is a "fact" does not make it so. If Kleinman wrote "FACT: Amanda Jones is a jerk," that does not mean he made a factual statement. Jones disagrees with Kleinman's conclusion that she is a "groomer" based on her own statements,[17] but the First Amendment permits such disagreement. Jones's claims fail.

### 2.3    Jones Has Failed to Allege Actual Malice

Jones's argument on actual malice is so limited that it seems that she waives the issue. It relies solely on the proposition that reckless disregard may be found where a defendant's "'allegations are so inherently improbable that only a reckless

---

[16] This interview is mentioned in one of Kleinman's Safelibraries blog posts, which pre-dates any of the complained-of statements. *See* "Poster Girl for ALA: 'That Librarian' Amanda Jones Indoctrinates Students Without Parents Knowing," SAFELIBRARIES (Feb. 16, 2024), attached as **Exhibit 3**, available at: https://safelibraries.blogspot.com/2024/02/poster-girl-for-ala.html (last accessed Oct. 27, 2025).

[17] Jones also suggests these statements are actionable because they imply the existence of undisclosed false facts, but that is also untrue. Both of these posts are based on Jones's own admissions. ECF No. 1 at ¶ 33 ("She's gr—ming kids (fact, not defamation, **she says it**)"); *id.* at ¶ 36 ("Louisiana's middle school librarian child gr—mer (**fact via her own admissions**, not defamation) . . . .") (emphasis added).

13

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

man would have put them in circulation.'" *Durando v. Nutley Sun*, 37 A.3d 449, 460 (2012). Jones implies that Kleinman's only argument as to actual malice is that it is not inherently improbable to think Jones could engage in grooming behavior because sexual misconduct among educators is rampant. ECF No. 54 at 35. That is not Kleinman's position.  Kleinman's position is that Jones' argument seems to boil down to "it is absurd to think that an educator would engage in grooming behavior" when sexual abuse in public schools is an epidemic.

Jones publicly advocated for children having access to books with sexual content. ECF No. 53-2; ECF No. 53-4 at Opening Brief, pp. 7-9. She advocates for the availability of sexually explicit books to be made available in public libraries, places with no means of preventing children from accessing them. *That Librarian* at 42, 55-56. She admitted to priming her own middle schoolers to consider sexual topics like consent and the #MeToo movement, knowing parents would be outraged if she were to address such topics directly. Shepard Dec. at ¶ 5.[18] The Court need not even consider such evidence, given the lack of actual malice *allegations*, another issue Jones does not address. She fails to even plead facts to support actual malice,

---

[18] And let us not forget the millions of Americans who share Kleinman's view that Jones's own admitted conduct, as well as conduct similar to it by other educators and librarians, constitutes child grooming, which Jones does not address. ECF Nos. 53-6, 53-7, 53-8, & 53-10. Indeed, the dozens of media articles and interviews that Jones flaunts on her own website, and which establish her nationwide public figure status, defeat any possibility of showing actual malice. ECF No. 53-2.

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

and even if she had, the indisputable facts and her own statements make it clear that actual malice could never be shown here.

## 3.0   CONCLUSION

Jones seems to think that her beliefs, that sexual material should be available to minors, are noble beyond critique.  Perhaps she is right.  Perhaps her middle school students should be exposed to such topics, surreptitiously, despite what their parents want.  Perhaps it is right and good that minors can access *Gender Queer* and *Let's Talk About It,* or any other book, with the only impediment being a parent helicoptering over the child at all times.  Maybe she is right and the world would be a better place if 14 year olds could access books in public libraries that teach them how to properly insert a butt plug.  "[T]ime has upset many fighting faiths" *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting), and perhaps one of those fighting faiths is the notion that such topics are better reserved for people who surpass the age of majority.  Jones has every right to be part of the movement to shift the Overton window on what minors read and encounter.  But Kleinman has every right to resist this effort, and if his tone seems harsh or impolite to Jones, that is no reason for this Court to take a wrecking ball to the First Amendment.

The Court should grant Kleinman's UPEPA Motion.

Dated: October 27, 2025.                 Respectfully Submitted,

/s/ Vincent S. Verdiramo                  /s/ Marc J. Randazza
Vincent S. Verdiramo, 024691986           Marc J. Randazza (*Pro Hac Vice*)
vincent@verdiramolaw.com                  mjr@randazza.com, ecf@randazza.com
Verdiramo & Verdiramo Esqs. PA            RANDAZZA LEGAL GROUP, PLLC
3163 Kennedy Boulevard                    30 Western Avenue
Jersey City, New Jersey 07306             Gloucester, MA 01930
Tel: 201-798-7082                         Tel: (978) 801-1776

                                          *Attorneys for Defendant.*

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Vincent S. Verdiramo
Vincent S. Verdiramo, 024691986

RANDAZZA | LEGAL GROUP

Reply in Support of Motion for Judgment on the Pleadings
3:24-CV-00972-BAJ-SDJ