<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| AMANDA JONES,<br><br>             Plaintiff,<br><br>     v.<br><br>DAN KLEINMAN,<br><br>             Defendant. | Case No. 2:24-cv-10750 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Dan Kleinman's ("Kleinman") Motion for Judgment on the Pleadings (ECF No. 53) to dismiss with prejudice Plaintiff Amanda Jones's ("Jones") Complaint (ECF No. 1) pursuant to Federal Rule of Civil Procedure ("Rule") 12(c).[1] This Court has

---

[1] Kleinman moves to dismiss the Complaint with prejudice under New Jersey's anti-SLAPP statute, *i.e.*, Uniform Public Expression Protection Act ("UPEPA"), N.J. Stat. Ann. § 2A:53A-49, *et seq.* (*See generally* ECF No. 53.) Like other anti-SLAPP statutes, UPEPA provides a defendant with a streamlined and expedited motion process—often called a "special" motion or an "anti-SLAPP" motion—to dismiss a cause of action asserting a defamation claim relating to "a matter of public concern." N.J. Stat. Ann. § 2A:53A-50(b)(3); *see also Paucek v. Shaulis*, 349 F.R.D. 498, 509–10 (D.N.J. 2025); *Hackenberg v. Bozin*, Civ. A. No. 25-1024, 2026 WL 165478, at *1 (M.D. Pa. Jan. 21, 2026). A "special" motion to dismiss "shoulder[s] the plaintiff with a heightened or inverted pre-trial burden to avoid dismissal." *See Paucek*, 349 F.R.D. at 509–10; *see also* N.J. Stat. Ann. § 2A:53A-55(a)(3)(a) (requiring the court to dismiss the cause of action with prejudice if the plaintiff "fails to establish a *prima facie* case as to each essential element"). Additionally, the UPEPA requires the reviewing court to award attorneys' fees and costs to the prevailing movant pursuant to a "special" motion, a motion to dismiss or a summary judgment motion. *See Paucek*, 349 F.R.D. at 516–19 (holding provision mandating attorneys' fees and costs to a prevailing moving party substantive and applicable in the federal courts but provision mandating same to a prevailing responding party procedural and, as such, not applicable in the federal courts (citing N.J. Stat. Ann. § 2A:53A-58)).

Although Kleinman labels his motion as a "special" motion pursuant to UPEPA, Kleinman relies on neither the streamlined and expedited motion process nor the inverted pre-trial burden standard

jurisdiction pursuant to 28 U.S.C. § 1332(a). Jones filed an Opposition (ECF No. 54), and Kleinman filed a Reply (ECF No. 56). Having reviewed and considered the submissions filed in connection with the motion and having declined to hold oral argument pursuant to Rule 78(b), for the reasons set forth below and for good cause having been shown, Kleinman's Motion for Judgment on the Pleadings is **DENIED**.

## I.    BACKGROUND

"The difference between a motion to dismiss pursuant to Rule 12(b)(6) and Rule 12(c) is only a matter of timing and the Court applies the same standard to a Rule 12(c) motion as it would to a Rule 12(b)(6) motion." *Newton v. Greenwich Twp.*, Civ. A. No. 12-238, 2012 WL 3715947, at *2 (D.N.J. Aug. 27, 2012) (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). Therefore, for the purposes of this motion, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Jones. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Secs. Litig.*,

---

in support of same. (*See generally* ECF No. 53.) Nor could he in federal court. *See Paucek*, 349 F.R.D. at 512–13 (holding these provisions of the UPEPA conflict with Rules 12 and 56 and, as such, cannot apply in federal court); *see also Berk v. Choy*, 146 S. Ct. 546, 552 (2026) (holding "a valid [Rule] displaces contrary state law"). It appears to the Court the sole purpose of labeling the motion as a "special" motion rather than a Rule 12 motion was to request a mandated award of attorney's fees and costs as a prevailing party under the UPEPA. (*See* ECF No. 53-1 at 38.) A prevailing party's right to mandated attorney's fees and costs under the UPEPA, however, is not restricted to a "special" motion but may also be available when a defendant secures dismissal in the federal court under either Rule 12 or 56. *See Paucek*, 349 F.R.D. at 519. Such a request should be filed in a distinct and separate motion after the defendant secures dismissal. *See id.* ("If [the defendant] prevails on a Rule 12(c) motion for judgment on the pleadings or on a Rule 56 motion for summary judgment, he may file an application for attorney's fees under UPEPA."). Accordingly, the Court converts Kleinman's "special" motion to dismiss under the UPEPA to a standard motion for judgment on the pleadings under Rule 12(c) and, as such, Kleinman's request for attorneys' fees and costs is **DENIED AS MOOT**.

114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### A.      Factual Background

Jones is employed as an elementary school librarian in the Live Oak Middle School Library. (ECF No. 1 ¶¶ 2–3.) In 2021, she was named the School Library Journal National Librarian of the Year. *Jones v. Citizens for a New Louisiana*, 2023-0654 (La. App. 1 Cir. 10/7/25), 424 So. 3d 208, 213 n.1, *writ denied*, 2025-01341 (La. 2/10/26), 425 So. 3d 1207. Kleinman operates a blog titled "SafeLibraries." (ECF No. 1 ¶ 1.) He regularly promotes his blog on the social media platform X (f/k/a Twitter) under the handle "@SexHarrassed." (*Id.*)

On July 19, 2022, Jones attended a Livingston Parish Library Board meeting, during which she opposed a proposed policy to impose content-based book restrictions in the Livingston Parish Library. *Jones*, 424 So. 3d at 207. Michale Lunsford ("Lunsford") and Ryan Thames ("Thames") also attended the meeting. *Id.* at 213. Lunsford is the executive director of the non-profit organization Citizens for a New Louisiana. *Id.* Thames operates a Facebook blog titled "Bayou State of Mind." *Id.*

Following the meeting, Lunsford and Thames posted online accusations that Jones had advocated for "providing erotic and pornographic material to children[] and teaching children to perform sexual acts." *Id.* In support of same, Lunsford and Thames repeatedly referenced a book titled *Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human*, which had not been mentioned at the meeting. *Id.* As a result of these posts, Jones allegedly suffered harm to her personal and professional reputation and received death threats. *Id.*

On August 9, 2022, Jones filed a complaint against Lunsford, Thames, and Citizens for a New Louisiana, alleging their false statements portrayed Jones as both a criminal and a pedophile

3

and seeking injunctive relief to enjoin further harassment and defamation in the District Court of Louisiana captioned *Jones v. Citizens for a New Louisiana* (the "*Citizens* Action"). *Id.* Due to the *Citizens* Action, Jones received national attention.[2] (*See* ECF No. 54 at 7, 9.)

Following the initiation of the *Citizens* Action, Kleinman began publishing statements concerning Jones on both X and SafeLibraries. (*See* ECF No. 1 ¶¶ 20, 22–66, 68–72.) These statements can be effectively distilled into the following related categories: Jones shares age-inappropriate, sexual materials with school children (*id.* ¶ 27, 42, 72); Jones "grooms" school children (*id.* ¶¶ 26, 30, 32–34, 36, 38–40, 43–48, 50, 54, 56–62, 69–71); Jones "sexualizes" school children (*id.* ¶¶ 25, 28–29, 31, 36, 38, 49, 51–52, 54–55, 57, 65, 68); and Jones assists others in "grooming" and "sexualizing" school children (*id.* ¶¶ 24, 37). (*See also id.* ¶ 23 (stating Jones "trains students to use [Grindr] to meet men for a night"); *id.* ¶ 33 (stating Jones "preys" on children); *id.* ¶ 68 (stating Jones "targets" school children); *id.* ¶¶ 63, 66 (stating Jones and Live Oak Middle School are colluding "to violate state law pertaining to open public records"); *id.* ¶¶ 64–65 (claiming Jones "packs heat" to murder parents); *id.* ¶ 53 (implying Jones is a "child sex offender").) The statements often refer to Jones as a middle school librarian and the allegedly "groomed" and "sexualized" children as middle school children. (*See id.* ¶¶ 28, 33, 36, 38, 39, 43, 46, 54, 67–68.) Based on these allegations, Kleinman advocated for her termination as a middle school librarian. (*See id.* ¶¶ 41, 46, 67–68.) In 2024, Kleinman published similar accusations in an email issued to Live Oak Middle School Library. (*See id.* ¶ 67.) Due to these statements, Kleinman

---

[2] On October 7, 2025, the Court of Appeal of Louisiana, First Circuit held Jones has established a probability of success as to the elements of her defamation claim as Lunsford and Thames's statements were, if not defamatory *per se*, clearly susceptible of a defamatory meaning. *Jones*, 424 So. 3d at 221.

has received national attention and has been featured as a guest for a ticketed event and a radio talk show. (*See id.* ¶¶ 3, 14–15.)

### B.    Procedural History

On November 26, 2024, Jones filed the Complaint. (ECF No. 1.) The Complaint alleges two common-law causes of action: defamation (Count One) (*id.* ¶¶ 73–98); and false light (Count Two) (*id.* ¶¶ 99–102).[3] Kleinman filed an Answer on January 21, 2025 (ECF No. 6), which he promptly amended on January 22, 2025 (ECF No. 7).

On October 10, 2025, Kleinman filed the Motion for Judgment on the Pleadings pursuant to Rule 12(c). (ECF No. 53.) Jones filed an Opposition on October 20, 2025 (ECF No. 54), and Kleinman filed a Reply on October 27, 2025 (ECF No. 56). Kleinman subsequently filed multiple notices of supplemental authority (ECF Nos. 57, 58, 59, 60, 61, 65, 66), to which Jones responded on January 9, 2026 (ECF No. 62). On February 26, 2026, Jones filed a correspondence updating the Court on the status of the *Citizen* Action. (ECF No. 63; *see also* ECF No. 64 (amending the correspondence to include a proper electronic signature).)

## II.    LEGAL STANDARD

Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: (1) no material issue of fact remains to be resolved; and (2) the entitlement to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d

---

[3] Jones filed an identical complaint in the United States District Court for the Middle District of Louisiana. (Civ. A. Nos. 24-972, 25-15342, ECF No. 1.) On September 5, 2025, the Honorable Brian A. Jackson, U.S.D.J., transferred the matter to the District of New Jersey pursuant to the "first-to-file rule." (Civ. A. Nos. 24-972, 25-15342, ECF Nos. 19, 20.) On September 23, 2025, Jones requested to withdraw the transferred matter (ECF No. 51), which the Court promptly granted (ECF No. 52; *accord* Civ. A. Nos. 24-972, 25-15342, ECF No. 23.)

Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See id.*

Furthermore, although a motion for judgment on the pleadings is appropriate after the pleadings have been closed, such a motion is reviewed under the same standards that apply to a motion to dismiss made under Rule 12(b)(6). *See Szczurek v. Pro. Mgmt. Inc.*, 627 F. App'x 57, 60 (3d Cir. 2015) (citing *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Muhammad v. Sarkos*, Civ. A. No. 12-7206, 2014 WL 4418059, at *1 (D.N.J. Sept. 8, 2014) (citing *Turbe*, 938 F.2d at 428) ("Where a defendant's motion is one for judgment on the pleadings pursuant to [Rule] 12(c), it is treated under the same standards as a Rule 12(b)(6) motion where it alleges that a plaintiff has failed to state a claim."); *Gebhart v. Steffen*, 574 F. App'x 156, 157 (3d Cir. 2014). "The difference between Rules 12(b)(6) and 12(c) is purely procedural as [Rule] 12(c) requests for dismissal are governed by the same standards as [Rule] 12(b)(6) motions." *Glob. Naps, Inc. v. Bell Atl.-N.J., Inc.*, 287 F. Supp. 2d 532, 539 (D.N.J. 2003) (citing *Turbe*, 938 F.2d at 428). As with a Rule 12(b)(6) motion, in deciding a Rule 12(c) motion, the court must "view[] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the" nonmovant. *Barnard v. Lackawanna Cnty.*, 696 F. App'x 59, 61 (3d Cir. 2017) (internal quotation marks omitted). A court may only grant a motion for judgment on the pleadings if the moving party "clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Rosenau*, 539 F.3d at 221 (quoting *Jablonski*, 863 F.2d at 290–91).

### III.    DECISION

Kleinman moves to dismiss the Complaint with prejudice pursuant to Rule 12(c). *See supra* n.1. Specifically, Kleinman argues Jones fails to allege sufficient facts in support of the necessary elements of a common-law defamation claim and a false light claim. (*Id.* at 24–37.) The Court begins with a choice of law analysis, then addresses each argument in turn.

### A.    Choice of Law Analysis

A federal court sitting in diversity "must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 373 (D.N.J. 2019) (quoting *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007)); *accord Zanetich v. Wal-Mart Stores E., Inc.*, 123 F.4th 128, 140 (3d Cir. 2024). New Jersey utilizes "the most-significant-relationship test, which consists of two prongs." *Mills*, 406 F. Supp. 3d at 373; *see also Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210, 219 (N.J. Super. App. Div. 2019) ("[O]ur courts apply the most-significant-relationship test in tort matters to resolve choice-of-law questions."). First, the court is required to determine whether a conflict exists between the potentially applicable state laws. *Mills*, 406 F. Supp. 3d at 373. If a conflict exists, the court is then required to "determine which state has the 'most significant relationship' to the claims asserted." *Paucek v. Shaulis*, 349 F.R.D. 498, 520 (D.N.J. 2025) (quoting *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008)).

### 1.    New Jersey & Louisiana Law Conflict

"A conflict of law arises when the application of one or another state's law may alter the outcome of the case or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." *In re Accutane Litig.*, 194 A.3d 503, 517 (N.J. 2018) (citation omitted)

(quoting *Cont'l Ins. Co. v. Honeywell Int'l, Inc.*, 188 A.3d 297, 311 (N.J. 2018)). If no conflict exists, the analysis ends, and New Jersey law applies. *See Mills*, 406 F. Supp. 3d at 373.

Here, Kleinman argues New Jersey law governs the substantive issues of this matter. (*See* ECF No. 53.) In contrast, Jones argues Louisiana law governs. (*See* ECF No. 54 at 19–28.) Although the parties agree the necessary elements required to sufficiently plead a common-law defamation claim and a false light claim under New Jersey and Louisiana law do not create an actual conflict (*see id.* at 20–24; ECF No. 56 at 5–6), the parties recognize the specific requirements and language of the state's respective anti-SLAPP statutes conflict (*see* ECF No. 54 at 24–26; ECF No. 56 at 6).

SLAPPs—strategic lawsuits against public participation—are lawsuits filed to silence a defendant exercising his First Amendment rights by forcing the defendant to either "abandon his speech or suffer through years of costly litigation." *Paucek*, 349 F.R.D. at 509. In response, an anti-SLAPP statute typically provides a defendant with "an expedited and streamlined process to dismiss claims implicating [the] defendant's speech to reduc[e] the burden in terms of time and costs." *Id.* (alteration in original) (internal quotation marks omitted). The strongest anti-SLAPP statutes apply broadly and commonly include the following features: a heightened burden on the plaintiff to show a likelihood of success on the merits at the pre-trial stage; a mandated stay of discovery pending the outcome of a motion to dismiss or summary judgment; if the motion to dismiss or summary judgment is denied, an entitlement to an immediate interlocutory appeal; and if the motion is granted, mandated attorney fees and costs. *See Paucek*, 349 F.R.D. at 509 (citing Nicole J. Ligon, *Solving SLAPP Slop*, 57 U. RICH. L. REV. 459, 466 (2023); Benjamin Ernst, *Fighting SLAPPS in Federal Court:* Erie*, The Rules Enabling Act, and the Application of State Anti-SLAPP Laws in Federal Diversity Actions*, 56 BOSTON COLL. L. REV. 1181, 1188 (2015)). It

is well-established, "[m]andatory anti-SLAPP fee-shifting is one of the most important features of an anti-SLAPP statute." *Paucek*, 349 F.R.D. at 509.

Differences between anti-SLAPP statutes are sufficient to demonstrate a conflict of law requiring the Court to proceed "to the next step of the conflict of laws analysis." *See Paucek*, 349 F.R.D. at 520; *Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1320 (D. Utah 2015); *see also Donovan v. W. R. Berkley Corp.*, 566 F. Supp. 3d 224, 234 (D.N.J. 2021) (holding where state statutes provide for different remedies, such as attorney's fees and costs, "a conflict of law exists").

### 2.    Most Significant Relationship Test

To determine which state has the most significant relationship, the court must first identify the presumptive rule of the Restatement (Second) of Conflict of Laws (1971) ("Second Restatement") "for the specific kind of tort claims asserted." *Paucek*, 349 F.R.D. at 520 (citing *Camp Jaycee*, 962 A.2d at 455). "That presumptive rule determines the choice of law outcome unless the general tort principles outlined in Section 145 of the Second Restatement or the general principles regarding competing state interests outlined in Section 6 demand a different result." *Id.* at 520–21 (citing *Camp Jaycee*, 962 A.2d at 455; *Sarver v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016)).

Section 150 supplies the presumptive rule for multistate defamation claims "involving aggregate communications made over the internet." *Paucek*, 349 F.R.D. at 521 (citing *Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 160 A.3d 44, 75 (N.J. Super. App. Div. 2017)); *see also Monarch v. Gorman*, Civ. A. No. 14-5980, 2015 WL 5584555, at *3 n.1 (E.D. Pa. Sept. 22, 2015) (similarly utilizing Section 150 as the presumptive rule for multistate false light claims). The rule provides such a claim should be determined by the law of the state that "has the most

9

significant relationship to the occurrence and the parties," which "will usually be the state where the [plaintiff] was domiciled at the time." Restatement §§ 150(1), (2); *see also* Restatement § 150 cmt. e (stating the state of the plaintiff's domicile is assumed to be "the state where the plaintiff has suffered the greatest injury by reason of [her] loss of reputation"); *accord Paucek*, 349 F.R.D. at 521.

Here, the Complaint alleges Plaintiff is domiciled in Louisiana. (ECF No. 1 ¶ 8.) Furthermore, the Complaint alleges she has suffered the greatest injury to her reputation in Louisiana. (*See id.* ¶¶ 13, 17–18.) Kleinman denies neither allegation. (*See generally* ECF No. 53.) Accordingly, the presumptive rule provides the claims in this matter should be determined under Louisiana law, unless the rule is outweighed by the general tort principles under Restatement Section 145 or the state interest factors under Section 6.

a.    **General Tort Principles – Restatement Section 145**

Section 145 supplies the general choice of law factors involving all torts. *Paucek*, 349 F.R.D. at 523 (citing *Camp Jaycee*, 962 A.2d at 458, 461–63). These factors are: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Id.* (quoting *Camp Jaycee*, 962 A.2d at 458). However, in matters alleging multistate defamation claims involving aggregate communications made over the internet, the first and second factors, *i.e.*, the place where the injury and the conduct causing the injury occurred, "will not play an important role in the selection of the state of the applicable law." *Id.* § 145 cmt. e. In such matters, "the place of the plaintiff's domicil . . . is the single most important contact for determining the state of the applicable law." *Id.*; *accord id.* § 145 cmt. f. Accordingly, the general choice of law factors

strongly weigh in favor of an application of Louisiana law and, as such, do not outweigh the presumptive rule that the state with the most significant relationship to the claims is the state where the plaintiff was domiciled at the time.

**b.      The State Interest Factors—Restatement Section 6**

Section 6 supplies the state interest factors. *Paucek*, 349 F.R.D. at 524. The New Jersey Supreme Court has reduced these factors to the following: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 962 A.2d at 463 (quoting *Erny v. Est. of Merola*, 792 A.2d 1208, 1217 (N.J. 2002)). However, the New Jersey Supreme Court has emphasized these factors are not of equal weight. The most important factor is the fifth factor (the competing interests of the states); then the first and third factors (the interests of interstate comity and underlying the field of tort law); and the least important factors are the second and fourth (the interests of the parties and judicial administration). *Erny*, 792 A.2d at 1217 (citing *Fu v. Fu*, 733 A.2d 1133, 1142 (N.J. 1999)); *see also Paucek*, 349 F.R.D. at 524 (stating the federal court primarily focuses on first and fifth factors, *i.e.*, the competing interests of the states and the interests of interstate comity).

It is well-established, substantial differences between anti-SLAPP statutes may be sufficient to defeat the presumptive rule that the state with the most significant relationship to the claims is the state where the plaintiff was domiciled at the time. *See Paucek*, 349 F.R.D. at 524 (citing *Sarver*, 813 F.3d at 897–900; *Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 607–08 (E.D. Pa. 2018); *Evans v. TheHuffingtonPost.com, Inc., C.A.*, Civ. A. No. 22-1180, 2023 WL 5275383, at *3–5 (D. Del. Aug. 16, 2023)). Under such circumstances, the court should apply the law of the state with the clearly broader and stronger anti-SLAPP relief. *See id.* at 524–

11

25. This is especially so if the allegedly defamatory speech originated in the state with the broader and strong anti-SLAPP relief. *See Paucek*, 349 F.R.D. at 525. Absent substantial differences in the strength between anti-SLAPP statutes, however, "there is no reason to favor [one state]'s policy over that of [another]." *See Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 354 (D. Mass. 2017) (holding California's interest in protecting its citizens against SLAPPs does not inherently outweigh Massachusetts's "interest in protecting its citizens from tortious conduct"); *see also Evans*, 2024 WL 3949070, at *3 (holding the court may not assume one state's interest in protecting its citizen's right to his free speech inherently outweighs another state's interest in protecting its citizen's right to an uninterrupted enjoyment of her reputation).

Here, New Jersey's anti-SLAPP statute—UPEPA—and Louisiana's statute—Article 971 of the Louisiana Code of Civil Procedure ("Article 971")—are strong anti-SLAPP statutes. Both apply broadly to statements made in connection with a "public concern" or "issue" and permit a defendant to file a "special" motion to dismiss a defamation claim relating to same. *See generally* N.J. Stat. Ann. §§ 2A:53A-50 to -56; La. Code Civ. Proc. Ann. art. 971. However, neither statute includes all of the common features of the strongest anti-SLAPP statutes. *See Paucek*, 349 F.R.D. at 509; *see*, *e.g.*, La. Code Civ. Proc. Ann. art. 971 (failing to provide the right to file an immediate interlocutory appeal); *see also*, *e.g.*, N.J. Stat. Ann. § 2A:53A-52 (failing to mandate a stay of discovery). Furthermore, the comparative strength of each feature varies between statutes. For example, the UPEPA imposes a higher burden on the plaintiff to sufficiently state a defamation claim at the pre-trial stage. *Compare* N.J. Stat. Ann. § 2A:53A-55(a)(3)(a), -57, *with* La. Code Civ. Proc. Ann. art. 971. In contrast, although both Article 971 and the UPEPA require the court to award attorneys' fees and costs to a prevailing moving party, only Article 971 requires the court

12

to award same to a prevailing responding party. *Compare* La. Code Civ. Proc. Ann. art. 971(B), *with* N.J. Stat. Ann. § 2A:53A-58.

Under these circumstances, there is no reason to favor New Jersey's anti-SLAPP statute over Louisiana's statute. Both statutes equally apply to include the allegedly defamatory statements in this matter. *See* N.J. Stat. Ann. §§ 2A:53A-50(b)(3); La. Code Civ. Proc. Ann. art. 971(A)(1). Furthermore, both include the common features of the strongest anti-SLAPP statutes, including a heighted burden on the plaintiff to show a likelihood of success on the merits at the pre-trial stage, *see* N.J. Stat. Ann. § 2A:53A-55(a)(3)(a); La. Code Civ. Proc. Ann. art. 971(A)(1); *see also Diamond Ranch Acad.*, 117 F. Supp. 3d at 1320 (holding California law should apply where the California anti-SLAPP statute included a heightened burden feature and the Utah anti-SLAPP statute did not), and a mandatory award of attorneys' fees and costs to a prevailing moving party, *see* N.J. Stat. Ann. § 2A:53A-58(1); La. Code Civ. Proc. Ann. art. 971(B); *see also Paucek*, 349 F.R.D. at 524 (holding New Jersey law should apply where the UPEPEA mandated attorney fees and cost to the prevailing moving party and Maryland's anti-SLAPP statute did not). Finally, although the strength of each statute's features varies, neither statute's features are consistently stronger than the others. *See, e.g.*, N.J. Stat. Ann. § 2A:53A-55(a)(3)(a) (imposing a stronger heighted burden on the plaintiff); La. Code Civ. Proc. Ann. art. 971(D) (imposing a mandatory award of attorneys' fees and costs to a prevailing responding party). Therefore, as neither statute is clearly stronger than the other, there is no reason to favor New Jersey's policy over that of Louisiana. *See Evans*, 2024 WL 3949070, at *3.

Accordingly, New Jersey's interest in applying its own anti-SLAPP statute does not outweigh Louisiana's interest in protecting its citizens from tortious conduct. As such, the state interest factors are neutral and do not outweigh the presumptive rule that the state with the most

13

significant relationship to the claims is the state where the plaintiff was domiciled at the time—Louisiana.

### B. Rule 12(c)[4]

#### 1. Defamation Claim

"[A]lthough a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action. Accordingly, adjudicating such claims requires inquiries under both state and federal law." *McDowell v. Paiewonsky*, 769 F.2d 942, 945 (3d Cir. 1985) (citing *Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072, 1077 (3d Cir.1985)); *accord Hill v. Cosby*, 665 F. App'x 169, 174 (3d Cir. 2016). "In the first instance, the Court must determine whether the defendant has injured the plaintiff's reputation under the applicable state law. If so, then the Court must ascertain whether the First Amendment nevertheless prohibits the imposition of liability." *McDowell*, 769 F.2d at 945; *accord DeGroat v. Cooper*, Civ. A. No. 13-7779, 2014 WL 1922831, at *3 (D.N.J. May 14, 2014).

To sufficiently state a defamation claim under Louisiana law, a plaintiff must allege the following four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Watson v. Willis-Knighton Med. Ctr.*, 93 So. 3d 855, 858 (La. App. 2 Cir. 2012) (quoting *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669, 674; *Costello v. Hardy*, 03–1146 (La.1/21/04), 864 So. 2d 129, 139). Accordingly, "to

---

[4] Although Kleinman did not specifically address the elements of a defamation claim under Louisiana law in his moving papers (*see generally* ECF Nos. 53, 56, 57, 58, 59, 60, 61, 65, 66), the Court finds it appropriate to review Kleinman's argument under Louisiana law as both parties agree the necessary elements required to sufficiently plead a common-law defamation claim and a false light claim under New Jersey and Louisiana law do not conflict (*see* ECF No. 54 at 20–24; ECF No. 56 at 5–6).

prevail on a defamation claim, a plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words that caused plaintiff damages." *Jones*, 424 So. 3d at 218 (quoting *Costello*, 864 So. 2d at 139–40).

Here, Kleinman argues the Complaint fails to sufficiently allege the following elements: a false and defamatory statement (*see* ECF No. 53-1 at 24–32), and fault (*see id.* at 33–37). Kleinman does not claim the Complaint fails to allege the elements of unprivileged publication to a third-party or resulting injury. (*See generally id.*)

### a.  Defamatory & False Statement

The threshold issue in a defamation claim is whether the statement complained of is defamatory, *i.e.*, capable of defamatory meaning, which is an issue of law to be decided by the court. *See Johnson v. Purpera*, 2020-01175 (La. 5/13/21), 320 So. 3d 374, 390; *Costello*, 864 So. 2d at 140 "In evaluating whether a statement is capable of defamatory meaning, a court asks 'whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense.'" *Block v. Tanenhaus*, 867 F.3d 585, 592 (5th Cir. 2017) (quoting *Sassone*, 626 So. 3d at 352). In other words, the issue to be decided is whether the statement is objectively capable of a defamatory meaning or innuendo "considering the statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener," *Lewis v. M7 Prods., LLC*, 427 F. Supp. 3d 705, 724 (M.D. La. 2019) (quoting *Bell v. Rogers*, 698 So. 2d 749, 754 (La. Ct. App. 2nd Cir. 08/20/97)); *see also Johnson*, 320 So. 3d at 388 ("[W]hether a communication is capable of a particular meaning and whether that meaning is defamatory is a question for the court; whether a communication, which is capable of a defamatory meaning, was so understood by its recipient is a question for the trier of fact or the jury.").

15

"In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory *per se* and those that are susceptible of a defamatory meaning." *Schmidt v. Cal-Dive Int'l, Inc.*, 240 F. Supp. 3d 532, 542 (W.D. La. 2017) (quoting *Kennedy*, 935 So. 2d at 674). If the plaintiff establishes the statement complained of is defamatory *per se*, then the remaining elements of falsity, malice, and injury are presumed and "the burden shifts to the defendant to rebut the presumed elements." *Hoffman v. Bailey*, 257 F. Supp. 3d 801, 819–21 (E.D. La. 2017). In contrast, if the plaintiff fails to establish the statement is defamatory *per se*, then the plaintiff bears the burden to prove all five elements. *See id.* However, in matters involving statements made about a public figure, the plaintiff bears the burden to prove all five elements regardless of whether the statement is defamatory *per se*. *See Starr v. Boudreaux*, 2007-0652 (La. App. 1 Cir. 12/21/07), 978 So. 2d 384, 390.

A statement is defamatory *per se* if it either "expressly or implicitly accuse[s] another of criminal conduct" or "by [its] very nature tend[s] to injure one's personal or professional reputation." *Schmidt*, 240 F. Supp. 3d at 542 (quoting *Kennedy*, 935 So. 2d at 674). Examples of statements commonly found to constitute defamatory *per se* include accusations of business misfeasance, being infected with a "loathsome disease," or engaging in "sexual misconduct." *See Spears v. Louisiana Coll.*, Civ. A. No. 20-30522, 2023 WL 2810057, at *7 (5th Cir. Apr. 6, 2023); *see also Klocke v. Watson*, Civ. A. No. 20-10103, 2021 WL 5871884, at *7 (5th Cir. Dec. 10, 2021). Otherwise, a statement is defamatory if it "tend[s] to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person[,] or otherwise expose [the] person to contempt and ridicule." *Lewis*, 427 F. Supp. 3d at 724 (quoting *Kennedy*, 935 So. 2d at 674); *see also Jones*, 424 So. 3d at 217–19 ("Words

16

which convey an element of personal disgrace, dishonesty, or disrepute are defamatory." (quoting *Costello*, 864 So. 2d at 140)).

However, "[a] pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts, usually will not be actionable in defamation." *Zelenak v. Beauregard Elec. Coop. Inc.*, Civ. A. No. 24-1803, 2025 WL 2025177, at *3 (W.D. La. July 18, 2025) (quoting *Bussie v. Lowenthal*, 535 So. 2d 378, 381 (La. 1988)). That is "because without an assertion of fact there can be no falsity." *Wartelle v. Mintz*, 2021-769 (La. App. 3 Cir. 6/8/22) (quoting *Bussie*, 535 So. 2d at 380). Therefore, "an expression of opinion is actionable only if it implies the existence of underlying facts ascertainable by a reasonable person with some degree of certainty." *Zelenak*, 2025 WL 2025177, at *3 (quoting *Fitzgerald v. Tucker*, 737 So. 2d 706, 717 (La. 1999). "[A] purely subjective statement can be neither true nor false." *Wartelle*, 2021-769 (La. App. 3 Cir. 6/8/22) (quoting *Bussie*, 535 So. 2d at 380).

Here, the Complaint provides a sample of forty-nine statements Kleinman posted on X, published on his blog, or emailed to Live Oak Middle School in 2024. (*See* ECF No. 1 ¶¶ 23–72; *see also id.* ¶ 22 (claiming "Kleinman's false statements are too numerous to reproduce here").) As noted above, the statements can be effectively distilled into the following related categories: Jones shares age-inappropriate, sexual materials with school children (*id.* ¶¶ 27, 42, 72); Jones "grooms" school children (*id.* ¶¶ 26, 30, 32–34, 36, 38–40, 43–48, 50, 54, 56–62, 67, 69–71); Jones "sexualizes" school children (*id.* ¶¶ 25, 28–29, 31, 36, 38, 49, 51–52, 54–55, 57, 65, 67–68); and Jones assists others in "grooming" and "sexualizing" school children (*id.* ¶¶ 24, 37). The statements often refer to Jones as a middle school librarian, and the allegedly "groomed" and "sexualized" children as middle school children. (*See id.* ¶¶ 28, 33, 36, 38, 39, 43, 46, 54, 67–68.)

Based on these allegations, Kleinman advocated for her termination as a middle school librarian. (*See id.* ¶¶ 41, 46, 67–68.)

The statement Jones "grooms" school children is capable of a defamatory meaning. Although the term "grooming" is capable of multiple meanings,[5] within this context the term is better understood as "sexual grooming." The term is perhaps best defined by Kleinman, who claims in his moving papers the term refers to the "process by which a person prepares a child, significantly adults and the environment for the abuse of the child." (*See* ECF No. 56 at 8 (quoting Susan Raine & Stephen A. Kent, *The Grooming Of Children For Sexual Abuse In Religious Settings: Unique Characteristics & Select Case Studies*, AGGRESSION & VIOLENT BEHAVIOR, 181 (2019); *see also* ECF No. 53-1 at 26–29 (describing the term as exposing "young children to books with sexual content").) This definition is consistent with both the ordinary definition of the term, *see, e.g., Grooming*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, https://perma.cc/2F2R-T2Y2 (last visited May 26, 2026) (defining the term as "to build a trusting relationship with (a minor) in order to exploit them especially for nonconsensual sexual activity"), and the legal definition as evidenced by legal dictionaries, *see, e.g., Sexual Grooming*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining the term as "[a] sexual predator's attempt, usu. over time, to establish an emotional connection with a minor or members of a minor's family to lessen the child's inhibitions to sexual activity with the predator"), caselaw, *see, e.g., United States v. Batton*, 602 F.3d 1191 (10th Cir. 2010) (defining the term as "the process whereby a sex offender earns the trust and confidence of a victim before engaging in a sexual act" (internal quotation marks

---

[5] Other definitions of the term "grooming" include "to clean and maintain the appearance of (an animal)," "to make neat or attractive," and "to make (someone) ready for a specific objective." *Grooming*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, https://perma.cc/2F2R-T2Y2 (last visited May 26, 2026).

omitted)); *Feitosa v. Keem*, Civ. A. No. 22-377S, 2023 WL 2267055, at *1 n.2 (W.D.N.Y. Feb. 28, 2023) (defining term as "methodically build[ing] a trusting relationship with a child or young adult, their family, and community to manipulate, coerce, or force the child or young adult to engage in sexual activities" (internal quotation marks omitted)), and state criminal statutes, *see*, *e.g.*, La. Stat. Ann. § 14:81(C)(1)[6] (defining "grooming" to mean "the pursuit of an intimate relationship with a child under the age of seventeen by means of seduction, emotional manipulation, threats, promises, coercion, enticement, isolation, or extortion with the specific intent to commit a sex offense . . . against the minor, whether aggravated or not").

The statements Jones is a "sexual groomer" or was "sexually grooming" school children are neither mere insults nor rhetorical hyperbole. An allegation an individual is "sexually grooming" a minor implicates criminal conduct. At this time, multiple states have passed criminal statutes specifically criminalizing "sexual grooming." *See*, *e.g.*, Wis. Stat. Ann. § 948.098 (Mar. 8, 2026); Wyo. Stat. Ann. § 6-2-321 (Mar. 5, 2026); 720 Ill. Comp. Stat. Ann. 5/11-25 (Jan. 1, 2026); Tex. Penal Code Ann. § 15.032 (Sept. 1, 2025); Ark. Code Ann. § 5-27-307 (Aug. 5, 2025); Ind. Code Ann. § 20-26-5-11.2 (July 1, 2025); Miss. Code Ann. §§ 45-5-629, 97-5-32 (July 1, 2025); Mont. Code Ann. § 45-5-629 (July 1, 2025); Ohio Rev. Code Ann. § 2907.071 (Apr. 9, 2025); Iowa Code Ann. § 709.8A (July 1, 2024); Vt. Stat. Ann. tit. 13, § 3258 (July 1, 2024); Neb. Rev. Stat. Ann. § 79-879 (Nov. 14, 2020). In contrast, other states have held such conduct to be sufficient to support a criminal conviction under pre-existing statutes. *See*, *e.g.*, *State v. Perilloux*, 21-448 (La. App. 5 Cir. 12/20/23), 378 So. 3d 280, 305 (holding pattern of grooming behavior to be sufficient to support indecent behavior with a juvenile conviction); *State v. Davis*, 916 A.2d

---

[6] On August 1, 2025, Louisiana amended its criminal statute criminalizing "Indecent Behavior with Juveniles" to specifically address allegations of "sexual grooming." *Compare* La. Stat. Ann. § 14:81 (eff. Aug. 1, 2025), *with* La. Stat. Ann. § 14:81 (eff. Aug. 1, 2020).

493, 502 (N.J. Super. Ct. App. Div. 2007) (holding a defendant need not physically attempt to sexually assault a minor "for preliminary 'grooming' actions to ripen into an attempted sexual assault"); *see also* N.J.S.A. 2C:34-3(b); La. R.S. § 14:81(A)(2) (criminalizing the sharing of age-inappropriate, sexual materials with school children). However, even assuming a reasonable individual could not have understood the statements Jones is "sexually grooming" school children to be an allegation of criminal conduct, there is no question the statements are an accusation of sexual misconduct with a minor.[7]

Nor are the statements pure statements of opinion. A substantial number of statements are presented as true or false statements. (*See*, *e.g.*, ECF No. 1 ¶ 60 ("She's a gr—mer.")). Furthermore, a few claim the accusations of "sexual grooming" are "actual," "fact," and "truth," (*id.* ¶¶ 32–33, 36), whereas others state Kleinman had evidence of Jones's "sexual grooming" (*see id.* ¶¶ 30, 34, 39, 41, 63, 68). Based on this alleged evidence of "sexual grooming," Kleinman has advocated for Jones's termination as a middle-school librarian through multiple mediums.[8] (*Id.* ¶¶ 14–15, 41, 46,

---

[7] Kleinman claims "allegations like 'grooming' and 'sexualizing children' had been bandied about for years by others before any of Kleinman's complained-of statements" (ECF No. 53-1 at 32), *i.e.*, the "all the other kids are doing it" defense. At this step, the issue before the Court, however, is not whether the statement an individual is a "sexual groomer" or is "sexually grooming" children is defamatory under all sets of circumstances. Nor is the issue whether these statements are objectively capable of a non-defamatory meaning. *See Johnson*, 320 So. 3d at 388 (reserving such issues of fact for the jury). Rather, the sole issue before the Court is whether the statement is objectively capable of a defamatory meaning under these circumstances, and the Court finds it is. *See Block*, 857 F.3d at 592; *Lewis*, 427 F. Supp. 3d at 724.

[8] In support of his argument that the statements Jones is "sexually grooming" school children were pure statements of opinion, Kleinman argues the social media platform X "is a public forum where a reasonable reader will expect to find many more opinions than facts." (ECF No. 53-1 at 31 (quoting *Broughty v. Bouzy*, Civ. A. No. 22-6458, 2023 WL 5013654, at *5 (D.N.J. Aug. 7, 2023).) Kleinman, however, does not cite, nor has this Court found, any federal or state court decision holding a statement posted on X cannot be defamatory. *See*, *e.g.*, *Feitosa*, 2023 WL 2267055, at *6 (holding allegation the defendant posted on X the statement the plaintiff was a "groomer" of 12–15-year-old girls sufficient to state a defamation claim). Rather, the medium in which a statement is published is only a single factor the Court considers in determining whether the

20

62, 67–68; *see also id.* ¶ 53 (insinuating Jones should be surgically castrated as a child sex offender).)

Therefore, viewing the facts in the Complaint in the light most favorable to Jones, the Court finds the statements Jones is a "sexual groomer" or was "sexually grooming" school children to be objectively capable of a defamatory meaning, *i.e.*, Jones as a middle-school librarian was "sexually grooming" school children with the intent of sexually abusing the children. *See Lewis*, 427 F. Supp. 3d at 724. These statements are assertions of fact accusing Jones with, at worst, criminal conduct and, at best, sexual misconduct. As such, these statements are defamatory *per se*. *See Spears*, 2023 WL 2810057, at *7; *see also, e.g.*, *Jones*, 424 So. 3d at 221 (holding the statement posted on X that Jones was advocating for sharing erotica with and instructing children on how to perform sex acts were clearly capable of a defamatory meaning); *Feitosa*, 2023 WL 2267055, at *6 (holding the statement posted on X the plaintiff was a "groomer" of 12–15-year-old girls sufficient to state a defamation claim); *Miles v. Nat'l Enquirer, Inc.*, 38 F.Supp.2d 1226, 1228–29 (D. Colo. 1999) (holding accusation the plaintiff was a "pedophile" and "sex offender" constituted defamation *per se*); *Beu v. City of Vineland*, Civ. A. No. 20-2510, 2021 WL 856882, at *5 (D.N.J. Mar. 8, 2021) (holding accusation the plaintiff was a "pedophile" and a "rapist" constituted defamation *per se*). There is no question the allegation a middle-school librarian is "sexually grooming" school children would lower Jones's personal and professional reputation in the eyes of her community and cause others to avoid associating with her.

---

statement is defamatory. *See, e.g.*, *Jinni Tech Ltd. v. Red.com, Inc.*, Civ. A. No. 21-35967, 2022 WL 4093737, at *1 (9th Cir. Sept. 7, 2022) (applying Washington law). Kleinman's argument is further frustrated by the fact he published his statements on mediums other than X, including on his blog and through emails. (*See* ECF No. 1 ¶¶ 41, 63, 67–68; *see also id.* ¶¶ 14–15 (noting Kleinman has also been featured on the radio and as a speaker at a ticketed event.).)

Accordingly, the Complaint sufficiently alleges Kleinman published false and defamatory statements concerning Jones in support of the defamation claim. Having determined same, the Court must now determine the requisite level of fault Jones is required to allege under the First Amendment. *See McDowell*, 769 F.2d at 945.

### b.    Fault

"As a constitutional matter, the Supreme Court requires some showing of fault for a defamation claim." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 206 (D.N.J. 2011) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974)); *see also Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 272 (3d Cir. 1980) ("[T]he First Amendment forbids states to impose liability without fault . . . ."). The appropriate level of fault a plaintiff must show, however, differs depending on whether the plaintiff is a private or public figure. *See id.* at 206–07; *see also Starr*, 978 So. 2d at 390 (noting a public figure plaintiff "may not rely on any presumption based on the fact that the words are defamatory *per se*").

Under Louisiana law, a private figure plaintiff is merely required to allege facts demonstrating the defendant published the defamatory statement with negligent disregard for the truth. *See Costello*, 864 So. 2d at 143–44; *see also Gertz*, 418 U.S. at 347 ("[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."). In contrast, a public figure plaintiff is required to demonstrate the defendant published the statement with malice, *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Costello*, 864 So. 2d at 143 n.14 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)); *accord Berkery v. Gudknecht*, 763 F. App'x 288, 289 (3d Cir. 2019); *LaRavia v. Cerise*, 462 F. App'x 459, 463 (5th Cir. 2012). Therefore, to determine whether a

22

complaint sufficiently alleges facts showing the appropriate level of fault, the court must first determine the plaintiff's status as a private or public figure in the matter. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 938 (3d Cir. 1990) (noting such a determination is a matter of law, which must be decided by the court). On a motion to dismiss, the defendant bears the burden of showing the plaintiff is a public figure. *See Medure v. Vindicator Printing Co.*, 273 F. Supp. 2d 588, 612 (W.D. Pa. 2002).

The Supreme Court has recognized two alternative classes of public figures—"all-purpose" and "limited-purpose." *Farina v. Omari*, Civ. A. No. 24-11098, 2025 WL 2754030, at *2 (D.N.J. Sept. 29, 2025) (citing *Gertz*, 418 U.S. at 351). An "all-purpose" public figure is an individual who has "achieve[d] such pervasive fame or notoriety that [s]he becomes a public figure for all purposes and in all contexts." *Id.* (quoting *Gertz*, 418 U.S. at 351). An all-purpose public figure is best understood as an individual with such a level of renown as to be considered a household name. *See Schiavone Const. Co. v. Time, Inc. ("Schiavone II")*, 847 F.2d 1069, 1077 (3d Cir. 1988); *see also Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 498 (E.D. Pa. 2010) (providing the following examples of all-purpose public figures: President Barack Obama, Tiger Woods, and Oprah Winfrey).

A "limited-purpose" public figure is an individual who either "voluntarily injects [her]self or is [involuntarily] drawn into a particular public controversy and thereby becomes a public figure for *a limited range of issues*."[9] *Gertz*, 418 U.S. at 351 (emphasis added). "For example, a meat producer that aggressively advertised its product in the media becomes a limited[-]purpose public

---

[9] Although both the Supreme Court and the Third Circuit has recognized an individual may qualify as an involuntary public figure, this class of public figure is "exceedingly rare." *Gertz*, 418 U.S. at 345; *see also Marcone*, 754 F.2d at 1084 n.9 ("The one group of individuals that might truly be considered involuntary public figures are relatives of famous people."); *accord Schiavone I*, 619 F. Supp. at 704.

figure for comment on the quality of its product." *Marcone*, 754 F.2d at 1083; *see also McDowell*, 769 F.2d at 950 ("The actions of the plaintiff are sufficient to transform him into a public figure for the limited[-]purpose of his work on publicly financed building projects—the subject of the alleged defamatory remarks.").

The Third Circuit has articulated a two-step test to determine whether a plaintiff qualifies as a limited-purpose public figure.[10] *McDowell*, 769 F.2d at 948; *accord Amor v. Conover*, 635 F. Supp. 3d 363, 368 (E.D. Pa. 2022); *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 645 F. Supp. 1217, 1251 (D.N.J. 1986). "[W]hether a defamation plaintiff is a limited[-]purpose public figure," however, is a fact-specific question. *Amor*, 635 F. Supp. 3d at 368 (alteration in original) (quoting *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 455 (E.D. Pa. 2021)). Therefore, the courts have typically differed determining a plaintiff's status as either a private or public figure until "the later stages of litigation[] after a full factual record can be developed." *Id.* (internal quotation marks omitted) (quoting *Goldfarb*, 539 F. Supp. 3d at 455); *see also Gillon v. Bernstein*, Civ. A. No. 12-4891, 2013 WL 5159625, at *5 (D.N.J. Sept. 12, 2013).

---

[10] As the Supreme Court has not provided a bright-line test to determine whether an individual is a limited-purpose public figure, the circuit courts have employed various tests to determine same. *See e.g.*, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 591 (1st Cir. 1980) (employing two-prong test); *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984) (employing four-factor test); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982) (employing five-factor test); *Clark v. American Broadcasting Cos.*, 684 F.2d 1208, 1218 (6th Cir. 1982) (employing two-prong test); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013) (employing three-prong test); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir. 1980) (employing three-prong test); *see also Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988); *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987) (endorsing *Waldbaum*'s three-prong test); *Boismier v. Walters*, 777 F. Supp. 3d 1300, 1310 (W.D. Okla. 2025) (noting the Tenth Circuit has not employed a test but rather defers to state tests). Although the specific language of these tests differ, the tests share common elements, *i.e.*, the existence of a prior, proper public controversy and the plaintiff's voluntary and prominent participation in same. *See Gertz*, 418 U.S. at 351–52; *accord McDowell*, 769 F.2d at 948; *Lerman*, 745 F.2d at 136–37; *Fitzgerald*, 691 F.2d at 668; *Clark*, 684 F.2d at 1218; *Makaeff*, 715 F.3d at 266; *Waldbaum*, 627 F.2d at 1296–98.

Here, Kleinman argues Jones is a limited-purpose public figure and, as such, a heightened level of fault is required, *i.e.*, actual malice, which the Complaint fails to sufficiently allege. (ECF No. 53-1 at 33–37.) Kleinman does not argue the Complaint fails to sufficiently allege the lower level of fault reserved for private individuals, *i.e.*, negligence. (*See generally* ECF No. 53, 56.) Specifically, Kleinman claims the statements relate to a public controversy regarding the access of minors to age-inappropriate LGBTQ and sexual health materials in public libraries.[11] (*See* ECF No. 53-1 at 17, 27, 32).

---

[11] Jones concedes she is a limited-purpose public figure for purposes of the proper public controversy regarding the access of minors to LGBTQ and sexual health materials in public libraries. (*See* ECF No. 54 at 18.) She also concedes the statements she is "sexually grooming" school children are capable of an understanding relating to this public controversy. (*See id.* at 18; *see also* ECF No. 53-1 at 26–29 (claiming the term "grooming" has been utilized and would be understood by the recipients of these statements to describe an individual who has allegedly advocated for "making books like these available to a minor").) Both Kleinman and Jones, however, misconstrue the limited-purpose public figure test at this stage. Having determined the statements Jones was "sexually grooming" school children are objectively capable of a defamatory meaning or innuendo, the Court lacks the authority to consider and determine the subjective understanding or perception of the recipients of the statements. *Bell*, 698 So. 2d at 754; *see also Johnson*, 320 So. 3d at 388 ("[W]hether a communication is capable of a particular meaning and whether that meaning is defamatory is a question for the court; whether a communication, which is capable of a defamatory meaning, was so understood by its recipient is a question for the trier of fact or the jury."). It is well-established, such a determination is an issue of fact, which is reserved for the jury. *See Johnson*, 320 So. 3d at 388; *Hoffman*, 257 F. Supp. 3d at 821 (citing *Kosmitis v. Bailey*, 28,585 (La. App. 2 Cir. 12/20/96), 685 So. 2d 1177, 1180). Although the Court recognizes both a proper public controversy may exist regarding the access of minors to LGBTQ and sexual health materials in public libraries and these statements may be objectively capable of an understanding relating to same, the Court cannot hold these statements relate to that controversy as a matter of law at this time. At this stage, the Court is merely required to determine whether a statement is objectively *capable* of a defamatory meaning or innuendo and, if so, whether there exists a public controversy relating to *that* meaning only. Nor does the Court have the authority to define the relevant public controversy so broadly as to include each capable understanding of a statement so as to find the plaintiff a limited-purpose public figure within every understanding of the statement. A limited-purpose public figure is "a public figure for *a limited range of issues*." *Mzamane*, 693 F. Supp. 2d at 498 (emphasis added) (quoting *Gertz*, 418 U.S. at 351).

### i.    A Public Controversy Exists

First, the court is required to identify the specific public controversy that existed prior to the publication of the allegedly defamatory statements, if any, which relate to the statements. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980); *see also Marcone*, 754 F.2d at 1083; *McDowell*, 769 F.2d at 948 (adopting *Waldbaum* definition of "public controversy"); *accord Schiavone Const. Co. v. Time, Inc. ("Schiavone I")*, 619 F. Supp. 684, 705 (D.N.J. 1985). The public controversy must be more than a mere "cause célèbre," *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976), or "matter that attracts public attention," *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979). *See also Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."). Rather, the controversy must be "a real dispute, the outcome of which affects the general public or some segment of it." *McDowell*, 769 F.2d at 948–49 (quoting *Waldbaum*, 627 F.2d at 1296); *see also Marcone*, 754 F.2d at 1082–83 (declining to define the term more broadly to include "all disputes of interest to the public"). Whether a defamatory statement can be fairly characterized as relating to a "real dispute" is to be determined by the statement's "content, form, and context." *McDowell*, 769 F.2d at 948 n.6 (quoting *Dunn & Bradstreet, Inc., v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)).

"Identification of the implicated public controversy is not a mere formality." *In re SoClean, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, Civ. A. No. 22-152, 2023 WL 8006602, at *61 (W.D. Pa. Nov. 17, 2023); *see also Hutchinson*, 443 U.S. at 135 (noting the identification of a proper "public controversy" is crucial to the fair balancing of the competing interests of free speech and reputation). The court must exercise care in identifying the public controversy, as the scope of the controversy will outline the limited range of issues for which a plaintiff will qualify as a

26

limited-purpose public figure. "For example, a meat producer that aggressively advertised its product in the media becomes a limited[-]purpose public figure for comment on the quality of its product." *Marcone*, 754 F.2d at 1083; *see also, e.g.*, *McDowell*, 769 F.2d 942 (finding the civil-engineer plaintiff who had participated in prior public building projects was a limited-purpose public figure within a public controversy relating to the construction of public building projects for statements on whether the plaintiff lacked the professional competence to complete the projects within the allotted time); *Amor*, 635 F. Supp. 3d at 368–70 (finding the dentist plaintiff who was a performance director as the Pittsburgh Renaissance Festival was a limited-purpose public figure within a public controversy relating to allegations of sexual misconduct against minors for statements the plaintiff had ignored complaints of sexual misconduct between the renaissance festival cast members, including members whom were under the age of eighteen at the time); *Mzamane*, 693 F. Supp. 2d at 500 (finding the headmistress plaintiff who was responsible for the health and safety of the students living at the private academy was a limited-purpose public figure within a public controversy relating to the safety and well-being of the students for statements the plaintiff had ignored complaints of abusive treatment between the dorm parents and the students); *Farina*, 2025 WL 2754030, at *1, 3 (finding the consultant plaintiff who had a significant social media following and had made several appearances discussing surgeon compensation and medical ethics was a limited-purpose public figure within a public controversy relating to privacy in healthcare and the ethical implications of leaking celebrity surgery information for statements the plaintiff lacked the qualifications to opine on these issues and was receiving kickbacks from surgeons); *Konowicz v. Carr*, Civ. A. No. 15-6913, 2019 WL 13402853, at *1 (D.N.J. July 31, 2019) (finding the content creator plaintiff who operated a website dedicated to weather reporting, had a significant social media following, and made appearances was a limited-purpose public

27

figure within a public controversy relating to weather reporting for statements the plaintiff was an amateur weather enthusiast).

A plaintiff may be held to be a limited-purpose public figure for purposes of one public controversy but be held to be a private figure for purposes of another related controversy. *See Waldbaum*, 627 F.2d at 1297 n.27. For example, the courts have generally held a plaintiff "well known in some circles" is not a limited-purpose public figure relating to allegations of criminal conduct or sexual misconduct absent the existence of a prior, proper public controversy relating to same. *See Gertz*, 418 U.S. at 351 (holding an individual's participation in community or professional affairs does not render her a public figure for all purposes and in all contexts); *see also, e.g.*, *Ralston v. Garabedian*, 676 F. Supp. 3d 325, 357 (E.D. Pa. 2021) (finding the teacher plaintiff was not a limited-purpose public figure within a public controversy relating to a history of sexual abuse at the school for allegations of sexual abuse against the plaintiff by a former student who "did nothing to voluntarily inject himself into *this* public controversy *before* it arose"); *Coleman v. Grand*, 523 F. Supp. 3d 244, 256–57 (E.D.N.Y. 2021) (finding the prominent musician plaintiff was not a limited-purpose public figure within a public controversy relating to allegations of sexual impropriety and pressure within the music industry for allegations of sexual misconduct who had not previously sought public attention and influence pertaining to his relationships, relationships generally, or sexual harassment allegations), *aff'd*, 158 F.4th 132 (2d Cir. 2025); *Steep Hill Lab'ys, Inc. v. Moore*, Civ. A. No. 18-373, 2018 WL 1242182, at *10 (N.D. Cal. Mar. 8, 2018) (finding the marijuana trafficking plaintiff was not a limited-purpose public figure within a public controversy relating to allegations of sexual misconduct and theft who had not previously sought public attention and influence pertaining to sexual assault, sexual harassment, or consent in the workplace), *aff'd*, 744 F. App'x 443 (9th Cir. 2018); *Elliott v. Donegan*, 469 F. Supp. 3d 40,

51 (E.D.N.Y. 2020) (finding the author and content creator plaintiff was not a limited-purpose public figure within a public controversy relating to allegations of physical sexual violence who had not previously sought public attention and influence pertaining to sexual assault, sexual harassment, or consent in the workplace); *Armstrong v. Shirvell*, 596 F. App'x 433, 444–46 (6th Cir. 2015) (finding the student council president plaintiff was not a limited-purpose public figure within a public controversy relating to allegations the plaintiff was "dangerous," a "radical homosexual activist," and a "major-league fanatic who is obsessed with imposing the radical homosexual agenda on the student body" who had not previously sought public attention and influence pertaining to his reputation or sexual behavior).

Reviewing the statements' content, form, and context, the relevant defamatory statements are that Jones as a middle-school librarian was "sexually grooming" school children. *See supra* Section III.A.1.a. These statements are best characterized either narrowly, as allegations Jones as a middle school librarian was "sexual grooming" school children specifically with the intent of sexually abusing the children, or broadly, as allegations middle school librarians are "sexual grooming" school children generally. *See Waldbaum*, 627 F.2d at 1297 n.27 (providing the court with discretion as to whether to define the controversy "narrowly" or "broadly" as "[a] narrow controversy will have fewer participants overall and thus fewer who meet the required level of involvement," whereas "[a] broad controversy will have more participants, but few can have the necessary impact"); *see also McDowell*, 769 F.2d at 948 (adopting *Waldbaum*'s definition of "public controversy"). Kleinman does not claim specific allegations of "sexual grooming" against Jones existed prior to the publication of his statements. (*See* ECF No. 53-1 at 17 (stating he does not claim "Jones is engaging in sexual intercourse with children or is 'grooming' or 'sexualizing' anyone in particular"); *id.* at 25–26 (stating he does "not accuse Jones of any specific instances of

conduct that would fit accusations of an actual crime or sexual activity"); *id.* at 31 (stating his statements were not intended to be viewed "as sober news reporting on Jones sexually molesting children.").) The courts, however, have consistently recognized the verbal, physical, and sexual abuse of school children to be a matter of public concern, "which affects the general public or some segment of it." *See Mzamane*, 693 F. Supp. 2d at 499–500 (quoting *McDowell*, 769 F.2d at 948–49). Furthermore, the Court recognizes the growing public concern regarding the "sexual grooming" of school children generally as evidenced by the multiple recent amendments to criminal statutes to specifically address this concern, which preceded the publication of the allegedly defamatory statements. *See supra* Section III.B.1.a. Therefore, the allegations that middle school librarians are "sexually grooming" school children relate to a proper public controversy, which existed prior to the publication of the allegedly defamatory statements. Having determined same, the Court must now consider whether Jones voluntarily injected herself into that controversy and assumed a position of prominence within it.

### ii.     The Nature & Extent of Jones's Participation

If the court identifies a specific public controversy that predated the publication of the allegedly defamatory statements, then the court must "consider[] the nature and extent of [the] plaintiff's participation in the controversy." *Nanavati*, 645 F. Supp. 1217, 1251 (citing *Marcone*, 754 F.2d at 1082). "Trivial or tangential participation is not enough." *Waldbaum*, 627 F.2d at 1297–98. A limited-purpose public figure is "one who has thrust [herself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *U.S. Healthcare*, 898 F.2d at 939 (internal quotation marks omitted) (quoting *Gertz*, 418 U.S. at 345). The Third Circuit has held two factors will inform this determination, *i.e.*, "the 'rationale of self-

help' and, more importantly, 'the notion of assumption of the risk.'" *Amor*, 635 F. Supp. 3d at 369 (quoting *McDowell*, 769 F.2d at 947–48); *accord U.S. Healthcare*, 898 F.2d at 938.

Jones's degree of involvement in the controversy surrounding the issue of whether middle school librarians were "sexually grooming" school children, if any, is *de minimis*. Although the record demonstrates Jones has voluntarily injected herself into the separate, but allegedly related, controversy regarding the access of *minors* to sexual health materials in *public libraries*, the record does not show Jones has advocated for the access of *school children* to such materials in *middle school libraries*. Jones's fame and notoriety relating to the former controversy alone cannot make her a public figure relating to the latter. *See Gertz*, 418 U.S. at 351; *see also Ralston*, 676 F. Supp. 3d 325. Rather, Jones can only be held to be a limited-purpose public figure as to the latter if the record establishes she has thrust herself to the forefront of *that* particular controversy in order to influence the resolution of same. *See U.S. Healthcare, Inc.*, 898 F.2d at 939; *see also McDowell*, 769 F.2d at 948 (stating a plaintiff's voluntary participation to be of greater importance in the determination than the plaintiff's access to channels of effective communication); *see also*, *e.g.*, *Elliott*, 469 F. Supp. 3d at 54 (holding the plaintiff's "extensive writings and interviews about sex, BDSM, and sexual assault—unrelated to workplace issues—[did not] transform[] him into a public figure with respect to the [#MeToo movement]").

Kleinman has not presented sufficient evidence by which to establish Jones has voluntarily injected herself into the public controversy regarding whether middle school librarians are "sexually grooming" school children so as to influence the resolution of same. (*See generally* ECF Nos. 53, 56, 57, 58, 59, 60, 61, 65, 66.) In response to Jones's claim she has never advocated for sharing age-inappropriate LGBTQ or sexual health materials with "elementary school-age children" (*see* ECF No. 54 at 6), Kleinman cites to an interview wherein Jones states she

encourages her students to read the books *New Kid* and *Maybe He Just Likes You*, which Jones claims are age-appropriate materials teaching children about the concepts of microaggressions and consent respectively (*see* ECF No. 56 at 16 (citing *see 118 Modern School Library Programs*, SCHOOL LIBRARIANS UNITED (Mar. 20, 2021), available at   https://perma.cc/J62W-ERRL)). Kleinman claims the interview is evidence Jones was "sexually grooming" her students. (*See id.* at 16.) Kleinman, however, fails to demonstrate a proper public controversy existed at the time relating to whether these materials, or other materials similarly teaching middle school children about the concepts of microaggressions and consent, are inappropriate for middle school students or whether encouraging a middle school student to read such materials constitutes as "sexual grooming," which Jones was either directly or indirectly responding to in order to influence the resolution of that controversy. (*See generally id.*) Therefore, the Court cannot find this interview alone establishes Jones has thrust herself to the forefront of that particular controversy so as to be a limited-purpose public figure relating to same.

Accordingly, Kleinman has failed to demonstrate Jones was a limited-purpose public figure within the scope of the broader proper public controversy as to whether middle school librarians were "sexually grooming" school children and, as such, the statements Jones is a "sexual groomer" or was "sexually grooming" school children do not trigger a heightened level of fault at this time. *See Schiavone I*, 619 F. Supp. at 705. Therefore, the Complaint sufficiently alleges Kleinman negligently published the allegedly defamatory statements in support of the defamation claim. Having determined same based on the record before the Court, the Court need not determine whether Jones is a private or public figure for purposes of the remaining statements at this time.

Based on the foregoing, Kleinman's Motion for Judgment on the Pleadings as to Count One of the Complaint (ECF No. 53) is **DENIED**.

32

### 2.    False Light

A false light claim "arises from publicity[,] which unreasonably places the plaintiff in a false light before the public." *Cook v. Warrier Energy Servs., Corp.*, Civ. A. No. 15-2195, 2017 WL 1356333, at *6 (W.D. La. Apr. 11, 2017). To sufficiently state a false light claim, a plaintiff must allege the following elements: (1) the defendant published a false statement concerning the plaintiff; (2) the publication was unreasonable; and (3) the publication "seriously interfere[d] with the plaintiff's privacy interest." *See Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 172 (5th Cir. 2018) (alteration in original) (quoting *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 3d 1386, 1389 (La. 1979)); *accord Farina*, 2025 WL 2709720, at *3–4; *Perere v. Louisiana Television Broad. Corp.*, 812 So. 2d 673, 676 (La. App. 1 Cir. 2001).

Although there are similarities between a defamation and false light claim, there are significant differences between the two torts. First, the allegedly false light publication "need not be defamatory in nature." *Farina*, 2025 WL 2709720, at *3. Rather, the publication "must be objectionable to a reasonable person under the circumstances and must contain either falsity or fiction." *Id*. Second, "[u]nlike a defamation action, it is not necessary that there be malicious intent on the part of the defendant." *Cook*, 2017 WL 1356333, at *6 (quoting *Perere*, 812 So. 2d at 1078). Third, a defamation claim protects an individual's reputation, whereas a false light claim protects personal dignity, *i.e.*, "the right to be let alone" and "the right to an inviolate personality." *Easter Seal Soc. v. Playboy Enters., Inc.*, 530 So. 2d 643, 646–47 (La. App. 4 Cir. 1988) (internal quotation marks omitted)); *see also Wood v. Hustler Mag., Inc.*, 736 F.2d 1084, 1088 (5th Cir. 1984) (stating a false light claim is founded on "mental anguish") (applying Texas law).

Here, Kleinman argues the Complaint fails to allege sufficient facts to allege a false light claim. (*See* ECF No. 53-1 at 37–38.) Having determined the Complaint sufficiently alleges

33

Kleinman negligently published allegedly "defamatory" statements in support of the defamation claim, *see supra* Section III.B.1.a, the Complaint sufficiently alleges Kleinman negligently published allegedly "objectionable" statements in support of the false light claim, *see Farina*, 2025 WL 2709720, at *3. Furthermore, the Complaint alleges the statements have exposed Jones to contempt and ridicule, which has injured both her professional and *personal* reputation. (*See* ECF No. 1 ¶¶ 79, 81, 96, 98.) Accepting the factual allegations in the Complaint as true and drawing all inferences in the light most favorable to Jones, the Complaint sufficiently alleges Kleinman negligently published the allegedly objectionable statements in support of the false light claim. *See Sharrif v. Am. Broad. Co.*, 613 So. 2d 768, 771 (La. Ct. App. 1993).

Based on the foregoing, Kleinman's Motion for Judgment on the Pleadings as to Count Two of the Complaint (ECF No. 53) is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, Kleinman's Motion for Judgment on the Pleadings (ECF No. 53) is **DENIED**. An appropriate order follows.

**Date: May 26, 2026**                    */s/ Brian R. Martinotti*
                                      **HON. BRIAN R. MARTINOTTI**
                                      **UNITED STATES DISTRICT JUDGE**